**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Kenneth and Doris Rainbolt, | ) | Case No. 09-09853 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| Doris Rainbolt, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 25-00274 |
| | ) | |
| v. | ) | |
| | ) | Hon. Michael B. Slade |
| U.S. Dep't of Education, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Kenneth and Doris Rainbolt filed a Chapter 7 petition on March 23, 2009.  (Case No. 09-09853, Dkt. No. 1)  The Chapter 7 Trustee filed a "no asset" report and the clerk entered a discharge order on July 7, 2009.  (*Id.* Dkt. Nos. 13, 18)  The bankruptcy case was closed a few days later.  (*Id.* Dkt. No. 20)

On July 25, 2025, Ms. Rainbolt asked me to reopen the bankruptcy case to initiate an Adversary Proceeding seeking to discharge her student loans pursuant to 11 U.S.C. § 523(a)(8).  (*Id.* Dkt. Nos. 23, 27)  I granted her motion to reopen (*id.* Dkt. No. 25) and entered a scheduling order (Adv. No. 25-00274, Dkt. No. 15).  Trial was held on May 14, 2026.  Ms. Rainbolt proceeded *pro se* and testified.  Both parties also offered documentary evidence.[1]

---

[1]   Ms. Rainbolt's Exhibits (DX) B–H and the Government's Exhibits (GX) 1–2 were admitted.  *See* Dkt. No. 28 (5/14/26 Hr'g Tr. (the "Tr.")) 6–7.  Ms. Rainbolt's proposed Exhibit A was excluded.  (*See* Dkt. No. 26)

1

Applying current law to the facts before me, I cannot discharge Ms. Rainbolt's student loan debt. The degree that Ms. Rainbolt incurred student debt to earn was not financially viable. But Ms. Rainbolt worked hard over the past sixteen years to advance her career. Today, Ms. Rainbolt and her husband have good jobs and stable incomes. They own a large home in which they have material equity. Ms. Rainbolt has retirement savings, too. While the loan obligations no doubt cause a hardship for the Rainbolts (in that they make it hard to build financial security), that hardship does not rise to the level required by the statutory standard to obtain a discharge of student loans in bankruptcy. I applaud Ms. Rainbolt's effort to seek relief *pro se*, but she did not meet her burden under 11 U.S.C. § 523(a)(8).

I thus find in favor of the defendants. My findings of fact and conclusions of law follow.[2]

I.

The parties stipulated to the following facts:

- Ms. Rainbolt is forty-six years old. Her husband Kenneth is forty-seven. They have a seventeen-year-old son.

- The Rainbolt family lives in New Palestine, Indiana, which is outside Indianapolis.

- The outstanding balance on Ms. Rainbolt's student loans is $84,733.44.

- The standard loan payment on Ms. Rainbolt's student loans is $542 per month.

(*See* Tr. 5–6)

Ms. Rainbolt testified credibly to the following additional facts:

- Ms. Rainbolt graduated in 2007 from Northern Illinois University. She received a B.F.A. in 3D Studio Art, with a concentration in ceramics. (Tr. 8)

---

[2] I have jurisdiction under 28 U.S.C. § 1334(b) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. The is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I). Venue is proper, too. *See* 28 U.S.C. § 1409(a).

- Ms. Rainbolt borrowed money to finance her education.  At the time of her graduation, her student loan debt was $55,452.50.  (*Id.*)

- Ms. Rainbolt began repaying her loans in 2008, shortly before her son was born.  (*Id.*) When she rejoined the workforce following her maternity leave, she did not obtain a job in ceramics because there were "limited job opportunities."  (DX B ¶ 19)

- Ms. Rainbolt joined the workforce in 2008, a period of extreme economic distress.  She worked at Starbucks.  (Tr. 8)  At the time, the Rainbolts were a young family and, with material debt and insufficient income, the family ended up in bankruptcy.  (*Id.* 8–9)  While in bankruptcy, she was told that "discharging student loans was pretty much impossible, so [she] would just have to live with them, so [she] did."  (*Id.* 9)

- Ms. Rainbolt worked for Starbucks for nine years trying to further her career.  But at some point she decided that she didn't "want to do this for the rest of [her] life, and [she] need[ed] a way to improve [her] family situation and to pay off [her] debts."  (*Id.*)  So she went back to school and earned a certification in architectural engineering and design technology. (*Id.*)  Her new skills enabled her in 2015 to get a new job, doubling her salary.  (*Id.*)

- Doubling her salary, though, didn't advance the ball much.  Ms. Rainbolt's student loan debt had ballooned with seven-plus years of interest between 2008 and 2015.  (*Id.* 9–10) She had been paying down her loans through income-based repayment plans—so she paid what she could and was required to pay, but it didn't cover the accruing interest.  (*Id.*) Then, when her new skills allowed her to get a new and better job, her income increased— but payments (as income-based payments) also increased, and she was *still* unable to pay the *interest* accruing.  That meant her debt continued to increase even though she paid all disposable income toward her student loans and her salary had doubled.  (*Id.* 10)

- Today, Ms. Rainbolt is a Director of Drafting and Design for an intralogistics company, a position she has held since 2021.  (*Id.* 16, 21)  Her team does AutoCAD and design work for her firm's distribution facilities and warehouses.  (*Id.* 16–17)  Her base salary is $105,000 per year.  (*Id.* 17)  Ms. Rainbolt is not guaranteed a bonus but has been a strong performer who has received a bonus most years.  Her gross income in 2023 was $126,530 (*id.* 35) and her gross income in 2025 was $132,270 (*id.* 36).

- While Ms. Rainbolt's employer is growing, most of the growth is on the automation side of the business; she works on the warehouse side.  (*Id.* 24–26)  Mr. Rainbolt is a paralegal, and he earns approximately $42,000 per year before taxes.  (*Id.* 17)  So opportunities for Ms. and Mr. Rainbolt to materially increase their income are limited.  (*Id.* 21–24)

- Overall, Ms. Rainbolt "make[s] a decent income" and is "able to help support [her] family." (*Id.* 10)  She has "done everything that [she] was supposed to do."  (*Id.*)  But because her loan payments on the income-based repayment plan are "proportionally larger because [her] income is larger," they are "still just as unaffordable now as they were then because of the interest that has accrued."  (*Id.* 10–11)  The balance on Ms. Rainbolt's student loan debt will continue to increase indefinitely because she cannot make payments that exceed the interest accruing in the period for which the payments are made.  (*Id.* 11–12)

3

- The Rainbolts own a 5 bedroom, 3 ½ bathroom, 3100 ft$^2$ home worth about $380,000; they have about $40,000 in equity. (*Id.* 16)  Their home expenses are currently $3,820/month: $2,420 for mortgage payments, taxes and insurance, $620 for maintenance and repair, $750 for utilities, and $30 in unidentified miscellaneous expenses. (*Id.* 21, 31)

- The Rainbolts bought the home in 2022, when they needed a large home with space for Ms. Rainbolt's aging mother. (*Id.* 14–15)  But since then, Ms. Rainbolt's mother has moved into a memory care facility, meaning that she no longer lives in the family home and the couple is no longer responsible for any of her expenses. (*Id.* 14–15, 37–38)

- The Rainbolts have one seventeen-year-old son. (*Id.* 39; *see also* DX B ¶ 3)  When he turns eighteen, Ms. Rainbolt does not know if he will be asked to contribute rent. (Tr. 40)

- The Rainbolts share a 2022 Nissan Frontier, which will be paid off in three years. (*Id.* 38–39) They also own a 2013 Chevrolet Cruze, which will be paid off in three to four years. (*Id.*)  Their son drives the Cruze, for which he pays his parents $180 per month. (*Id.* 32)

- All told, Ms. Rainbolt has paid $21,538 toward her student loan debt. (*Id.* 11–12)  Today, her payments are in administrative forbearance under the SAVE plan previously permitted by the federal government. (*Id.* 19)  That will end soon.[3]

- The Rainbolts currently have, based on their existing earnings and expenses, between $200 and $300 each month to pay student loans. (Tr. 20)

Ms. Rainbolt has worked hard to understand her repayment options—something that is challenging, particularly without counsel.[4]  She argues that "how much money I make is not the issue.  It's the structure of the repayment options available.  Both options available [which she believes to be either $1,000/month for twenty-eight months or $540/month for thirty years, until she is seventy-six] would result in significant hardship for my family." (Tr. 42)  Based on that assertion, Ms. Rainbolt seeks discharge of her student debt under 11 U.S.C. § 523(a)(8).

---

[3]  *See generally* Tara Siegel Bernard, *Student Loan Repayments are Being Overhauled.  What Borrowers Should Know*, N.Y. TIMES (May 26, 2026), *available at* https://www.nytimes.com/2026/05/25/your-money/student-loans-repayment-save-biden.html?smid=url-share.

[4]  The government stipulated to the monthly sum, but it did not know how long Ms. Rainbolt would have to continue making payments for her debt to be repaid in full. (Tr. 55–56)  Ms. Rainbolt also mentioned that she believes her payment terms could be $1000 per month for twenty-eight months if she continued in income-based repayment. (*Id.* 41)  But the government was unable to confirm if this was correct. (*Id.* 67)  And more options may be available.  *See, e.g.*, Bernard, *supra* n. 3.  For this and other reasons, I understand Ms. Rainbolt's frustration.  Not even the government could give Ms. Rainbolt firm answers on what her payment options are and when, even if she makes the payments for a long period going forward, her debt will be repaid in full.  That said, because the $542 monthly payment was stipulated by both parties, I will reference that sum here.

III.

The Bankruptcy Code provides that "[a] discharge . . . does not discharge an individual debtor from any debt" related to student loans "made, insured, or guaranteed by a governmental unit" unless "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. § 523(a)(8).  Section 523(a)(8) is self-executing—it "renders student loan debt presumptively nondischargeable 'unless' a determination of undue hardship is made."  *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 n.13 (2010) (noting the distinction between the treatment of student loan debt and other debts listed in Section 523(c) which are presumptively dischargeable); *see also Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 450 (2004) ("Unless the debtor affirmatively secures a hardship determination, the discharge order will not include a student loan debt.").

In 1993, the Seventh Circuit adopted the Second Circuit's *Brunner* test for assessing what constitutes an "undue hardship."  *See Tetzlaff v. Ed. Credit Mgmt. Corp.*, 794 F.3d 756, 760 (7th Cir. 2015) (citing *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) and *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)).  Under that test, to discharge student loan debt, debtors must prove that: (1) they cannot maintain even a minimal standard of living if forced to repay the loans; (2) this state of affairs is likely to persist for a significant portion of the repayment period; and (3) they have made good faith efforts to repay the loans. *Tetzlaff*, 794 F.3d at 760.  It is the debtor's burden to prove each element of the *Brunner* test by a preponderance of the evidence, and a miss on any element is dispositive, as "[i]f the debtor fails to establish any one of the elements, the test has not been met and the court need not continue with the inquiry."  *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002).

5

*Brunner* created a "case-specific, fact-dominated standard." *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013). But complicating the matter, while continuing to apply *Brunner*, the Seventh Circuit made clear in *Krieger* that I am to apply the statute as written. As Judge Easterbrook wrote for the court, the Code makes discharge "possible when payment would cause an 'undue hardship'" and "[i]t is important not to allow judicial glosses, such as the language in *Roberson* and *Brunner,* to supersede the statute itself." *Id.*

I read *Krieger* to suggest that the "judicial glosses" in *Brunner* and *Roberson* could be read to set a bar to discharge that is higher than Section 523(a)(8)'s text.[5] That said, since *Krieger* clarified the need to focus on Section 523(a)(8)'s forest rather than *Brunner* and its progeny's trees, the Seventh Circuit has enforced *Brunner* without reservation or caveat three times. *See Platt v. U.S. Dep't of Educ.*, 775 Fed. Appx. 253, 254 (7th Cir. 2019); *Williams v. U.S. Dep't of Educ.*, 752 Fed. Appx. 363, 364 (7th Cir. 2019); *Tetzlaff*, 794 F.3d at 758. So the task at hand is not completely straightforward.

I interpret these potentially inconsistent directives as follows: I will apply the plain text of Section 523(a)(8) and the "judicial gloss" of *Brunner*'s three-part test, separately and together. In some cases the two approaches may produce different results. If there is a conflict, Congress's plain language should govern. Fortunately there is no conflict here: based on the evidence, there is no "undue" hardship in Ms. Rainbolt paying the amount sought for the foreseeable future.

A.

I start with the text of Section 523(a)(8) and first principles of statutory interpretation. The Bankruptcy Code does not define "undue hardship." The seminal legal dictionary defines "undue" as "[e]xcessive or unwarranted" and "hardship" as "[p]rivation; suffering or adversity."

---

[5] The government's takeaway from *Krieger* aligns with mine; its counsel agreed that "the Seventh Circuit in *Krieger* did state that . . . the *Brunner* standard kind of overstates what the undue hardship standard is." (Tr. 58)

BLACK'S LAW DICTIONARY (10th ed. 2014) 832, 1759.  Other reputable dictionaries align.[6]  And the Supreme Court has interpreted the same words in other statutes similarly—using the same dictionary definitions.[7]  As the Seventh Circuit suggested in *Krieger,* the ordinary meaning of Congress's statutory terms should suffice in most (if not all) cases.[8]  It makes sense to start there.

The reality is that all individual debtors are suffering from material financial hardship.  And requiring anyone who is in enough distress to file for bankruptcy to pay back a material sum of student loans would impose some hardship upon them.  The key statutory term is "undue."  The gist of the question posed by the plain text of Section 523(a)(8) is whether requiring Ms. Rainbolt to pay student loan debt of $542/month for the foreseeable future would cause her family to suffer in ways that are excessive and unwarranted given her family's income (assuming it is maximized) and reasonable expenses (assuming they are minimized).

The first prong of the *Brunner* test asks this question with what *Krieger* characterized as "judicial gloss."  Specifically, *Brunner* and its progeny direct me to decide whether requiring Ms. Rainbolt to pay $542 per month toward her student loan debt would prevent her and her dependents from enjoying even a "minimal" standard of living.  *Roberson*, 999 F.2d at 1135 (citing *Brunner*, 931 F.2d at 395).  Phrased that way, the distress required to satisfy *Brunner*'s first prong is extreme.  Some cases applying the *Brunner* test underscore that harsh-sounding approach by making clear that to justify a discharge, a debtor must show that repaying student

---

[6]   *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981) 1033, 2492 ("SUFFERING, PRIVATION" that is "EXCESSIVE, IMMODERATE, UNWARRANTED . . . [and/or] contrary to justice, right, or law"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1996) 824, 1949 ("[e]xtreme privation; suffering" that "[e]xceed[s] what is appropriate or normal; excessive").

[7]   *See Groff v. DeJoy*, 600 U.S. 447, 468–69 (2023) (defining "undue hardship" in Title VII of the Civil Rights Act as when "the requisite burden, privation, or adversity [] rise[s] to an 'excessive' or 'unjustifiable' level") (citing various dictionaries and Supreme Court precedent interpreting other statutory schemes).

[8]   *See also* Antonin Scalia and Bryan Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 ("The ordinary meaning rule is the most fundamental semantic rule of interpretation.").

7

loan debt would result in "more than simply tight finances."  *In re Davis*, 608 B.R. 693, 704

(Bankr. N.D. Ill. 2019) (citing cases); *see Greene v. U.S. Dep't of Educ.*, 770 F.3d 667, 670 (7th

Cir. 2014) (describing the question as whether the debt imposed by student loans is "crushing").

But even if we don't limit a debtor discharging student loan debt to the bare minimum

standard of living (as *Brunner* states we must), debtors successfully making these requests must

first "engage in 'belt-tightening' practices to make repayment of loans more likely."  *In re Tuttle*,

600 B.R. 783, 800 (Bankr. E.D. Wis. 2019).  Which makes sense given that, by Congressional

design, the hardship justifying student loan discharge must exceed the "garden variety" distress

typical of individual bankruptcy filers.  *In re O'Hearn*, 339 F.3d 559, 564 (7th Cir. 2003).

Regardless of the degree of extremis required for discharge, "the question is whether the

debtor's present income and expenses allow for repayment" and "whether the debtor is

maximizing his or her personal income while minimizing current living expenses."  *In re

Bukovics*, 612 B.R. 174, 186 (Bankr. N.D. Ill. 2020) (quoting *Clark v. U.S. Dep't of Educ. (In re

Clark)*, 341 B.R. 238, 255 (Bankr. N.D. Ill. 2006)).  The government claimed at argument that

"it's never been the Department's position that someone has to go above and beyond what the

normal call of duty would be" (Tr. 59–60) in maximizing income and minimizing expenses.  I

question that—*Brunner* and its progeny may require more, and some of the government's

arguments (as described below) certainly demand more—but I will take the government at its

word and evaluate whether Ms. Rainbolt has answered the call to maximize income and

minimize expenses as required by the caselaw, a process akin to evaluating disposable income in

Chapter 13 cases.  *See Clark*, 341 B.R. at 250.

To set the stage, Ms. Rainbolt testified that, based on her current income and expenses,

she has between $200 and $300 per month net with which to pay student loans.  (*See* Tr. 47

8

("We have an extra $240 at the end of each month.")) The question is whether, with reasonable further belt tightening and living within a frugal budget, she could make more, or spend less, creating an additional approximately $300/month to repay her student loan debt. The answer appears to be yes.

On the revenue side, I have little doubt that Ms. Rainbolt is maximizing her income. The degree that she incurred student debt to earn is at best adjacent to her current job or any other income-maximizing opportunities. But she went back to school, and her additional investment in education (for which she did not incur additional federal student loans) doubled her salary. The evidence also demonstrates that Ms. Rainbolt is a hard worker and a solid performer who earns bonuses and raises when available; her trial testimony was very credible. From it and the documentary evidence, I find that Ms. Rainbolt is doing everything she can to earn every dollar she can to support her family and repay her debts.

It is the other side of the ledger where Ms. Rainbolt didn't satisfy her burden. By statute, she needed to show that her family would experience excessive suffering and privation, but the record does not suggest the Rainbolts have sunk (or would sink) so low. The government focuses on the Rainbolts' ability to reduce their home-related expenses (Tr. 50) and I agree that there is room for material savings on that front that should fill the gap between this household's net income and the $542/month student loan debt payments, at least for a while. The government introduced evidence that the IRS standard for home-related expenses of a three-person family in Hancock County, Indiana, suggests that this family should be spending $2,014/month. (GX2; *see* Tr. 29) The Rainbolt family's home-related expenses are approximately $3,800/month—nearly double that. (*See* Tr. 31–32)

9

Bankruptcy courts often rely on the IRS expense metrics in evaluating whether a debtor has minimized their expenses—both in evaluating confirmation of proposed Chapter 13 plans generally[9] and in deciding student loan discharge cases.[10] I asked the government at argument where the IRS statistics came from; counsel did not know. (Tr. 51–52) The government website housing these figures states that they are valid until this month and "include mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, residential telephone service, cell phone service, cable television, and Internet service" and are "derived from U.S. Census Bureau, American Community Survey and Bureau of Labor Statistics data, and are provided by state down to the county level."[11]

In future cases where the question is closer, I would expect the government to offer additional substantive evidence, such as local apartment pricing or the cost of a smaller home better suited for a family of three (soon to have one less dependent). *Compare In re Hopson*, 588 B.R. 509, 514 (Bankr. N.D. Ill. 2018) (denying discharge of student loans given substantive evidence that debtor could reduce expenses by moving). But here I am persuaded by the government's commonsense arguments, which were well and respectfully articulated by counsel. The government's logic seems inescapable: "We have a three-person family that's paying for a five-bedroom, three-and-half bed house. . . . She can downsize, Your Honor. She can rent. We

---

[9]   11 U.S.C. §§ 707(b)(2)(A)(ii), 1325(b)(1)(B); *see, e.g.*, *In re Luedtke*, 508 B.R. 408, 413–14 (BAP 9th Cir. 2014) (sustaining objection to Chapter 13 plan because debtor sought to take vehicle-related deductions outside IRS National Standards and Local Standards); *In re Hager*, 447 B.R. 876, 878 (Bankr. D. Minn. 2011) (denying confirmation when proposed Chapter 13 plan provided for monthly expenses $600 higher than IRS National Standards and Local Standards).

[10]   *E.g.*, *O'Hearn*, 339 F.3d at 565 ("Many couples are forced to live in less appealing housing because of the financial obligations undertaken by one or the other."); *Bukovics*, 612 B.R. at 88 (evaluating debtor's food expenses in student loan discharge case against IRS national standards); *In re Eliason*, 653 B.R. 646, 653–54 (Bankr. W.D. Wis. 2023) (evaluating debtor's expenses in student loan discharge case against IRS national standards), *aff'd sub nom Bank of N. Dakota v. Eliason*, 754 F. Supp. 3d 823 (W.D. Wis. 2024).

[11]   *Indiana - Local standards: Housing and utilities*, IRS (Feb. 11, 2026), https://www.irs.gov/businesses/small-businesses-self-employed/indiana-local-standards-housing-and-utilities.

don't believe this is—for undue hardship, right, we were trying to separate that from normal financial hardship, because it's 523(a)(8)." (Tr. 53–54)  And as a practical matter, it's hard to believe that Section 523(a)(8) allows discharging student loan debt where a debtor, during the loan repayment period, has been able to build up material equity in a five-bedroom house and retirement savings that, combined, approximately equate to the loan amount owed.[12]

The evidence on exactly how much money the Rainbolts can save from downsizing their home is unclear—the government could have made this analysis much easier by providing more specific examples of available and more modest home expenses, rental housing costs, or both. But given the wide gap between the published IRS statistics for expected three-person family housing expense in the area near Ms. Rainbolt's home and this family's actual expenses, it seems likely that downsizing their housing expense will address the problem.  This will no doubt be inconvenient for the Rainbolts, and moving comes with its own material expenses; I do not mean to minimize the burden.  But I note that they would not have purchased such a large home in the first place but for the need at the time to have space for Ms. Rainbolt's mother.  (Tr. 37)  No such need exists today.  And if downsizing or switching to renting for a time would not yield extra net income, perhaps the family could choose to stay in their home and find a renter for one (or two) of the empty bedrooms; as the evidence showed, Ms. Rainbolt's mother was paying rent of $400/month while living there.  (*Id.*)  To the extent there are brief periods when the Rainbolts fall short, they could divert less income to retirement savings[13] or reduce spending in other

---

[12]  Ms. Rainbolt is saving $409.70/month for retirement (DX B ¶ 15(a)(ii)) and her 401k account—which presumably began when she started working for her current employer—contains over $36,000 (*id.* ¶ 29).  It is unlikely that Congress contemplated the discharge of student loan debt (approximately $84,000) that, here, is approximately equal to the combined retirement savings ($36,000) and home equity (over $40,000) that a debtor has been able to build up and save during the period their student loan debts have been outstanding.

[13]  To be clear, I'm not suggesting that $409/month contributions to Ms. Rainbolt's 401(k) are unreasonable or that a debtor, by definition, enjoys a better than "minimal" standard of living if they simultaneously save for retirement.  *See, e.g.*, *In re Promisco*, 625 B.R. 715, 726 (Bankr. N.D. Ill. 2021) (finding that depending on the circumstances, 401(k) contributions may be reasonable and appropriate parts of a debtor's go-forward budget);

11

ways.[14] The Rainbolt family's household income exceeded $100,000 every year since 2022 and last year approached $150,000. (*See* DX H) They are not living an excessive lifestyle to be sure, but a few spending adjustments do seem possible to enable the $542/month student loan payments for the foreseeable future. *See Tuttle*, 800 B.R. at 800 ("While the debtors do not live extravagantly, cases interpreting sec. 523(a)(8) require 'belt-tightening' so that taxpayers are more likely to recoup their investment in student borrowers.").

The bottom line is that Ms. Rainbolt did not satisfy her statutory burden of demonstrating that paying $542/month toward her student loan debt for the foreseeable future would create excessive suffering for her and her dependents. And, she did not come close to satisfying the first *Brunner* requirement, which required her to show that her family could not enjoy even a minimal standard of living if she were forced to repay the loans.

B.

The second prong of *Brunner* requires debtors to demonstrate that their situation—one in which, to meet the first prong, they cannot pay their student loans and maintain even a minimal standard of living—is likely to persist for a material portion of the repayment period. *Roberson*, 999 F.2d at 1136 (citing *Brunner*, 831 F.2d at 1136); *see also Tetzlaff*, 794 F.3d at 759. Specifically, the debtor must show additional and "exceptional" circumstances "beyond the terms of the loans themselves" that show what courts (before *Krieger's* caveat) called a "certainty of hopelessness." *Davis*, 608 B.R. at 705. This standard—which, as more than a few

---

*In re Larson*, 426 B.R. 782, 791–92 (Bankr. N.D. Ill. 2010) (finding reasonable a debtor's 401(k) contributions while discharging student loan debt). Here, however, the fact that Ms. Rainbolt is "maxing-out" her 401(k) contributions and has accumulated material retirement savings thus far gives me further confidence that, for the foreseeable future, her student loan payments can be made without excessive hardship.

[14] Ms. Rainbolt's attestation also budgeted $400/month for "other expenses" (DX B § 15(d)(viii)) which perhaps can also be minimized if the family has a temporary budget crunch. That said, the government didn't challenge any line items in Ms. Rainbolt's budget other than home-related expenses. And Ms. Rainbolt's testimony showed her to be diligent in budgeting and money management. She deserves credit for that and for the belt tightening her family has already done. As described above, however, Section 523(a)(8) requires more.

12

courts have observed, seems higher than the text of Section 523(a)(8)—is "very difficult to meet and generally only debtors who are severely disabled, have psychiatric issues, have no usable job skills, or have very limited education are able to show that their inability to pay for the entire period is a 'matter of fact rather than speculation.'" *Bukovics*, 587 B.R. at 707; *see also Goulet*, 284 F.3d at 778 (citing *Roberson*, 999 F.2d at 1135).

*Krieger* is a good example of a scenario where a debtor satisfied *Brunner*'s second prong. There, the bankruptcy court addressed a debtor who was "living with her mother, age 75, in a rural community where few jobs are available; mother and daughter between them ha[d] only a few hundred dollars (from governmental programs) every month" and the debtor was "too poor to move in search of better employment prospects elsewhere." 713 F.3d at 883. Krieger had searched for a job for ten years without success and her CV was "not the sort of background employers are looking for." *Id.* at 884. She was "out of the money economy and living a rural, subsistence life." *Id.* at 885. Krieger did "not have assets or income and, the bankruptcy judge found, [was] not likely to acquire any." *Id.*

Ms. Rainbolt's scenario is not comparable. She has a solid and stable job, a base salary exceeding $100,000, and she routinely receives annual raises and year-end performance bonuses. Her husband has a good job in a field that always needs diligent and strong performers, too. The couple's annual income approaches $150,000, and the monthly payment of $542 that they are being asked to make toward student loan debt is not outsized relative to that income. And their son will soon graduate from high school and will no longer be a dependent. That reality should reduce the Rainbolt family's reasonable expenses in less than a year, augment the family's income, or both. In any event, the second prong of *Brunner* sets an exceptionally high (and grim) standard for debtors seeking to discharge their student loans, and it was not met here.

13

C.

*Brunner*'s third prong requires a debtor to show that they made good faith efforts to repay student loan debt prior to seeking its discharge. *Roberson*, 999 F.2d at 1136. The Seventh Circuit has evaluated this part of the test based on the debtor's efforts, during the period in which their student loans have been outstanding, to obtain employment, maximize income, minimize expense, and make loan payments along the way. *Tetzlaff*, 794 F.3d at 760-61. On this issue I agree with Ms. Rainbolt; to the extent this factor is relevant, she has tried in good faith to pay.

The government resists this finding. (Tr. 67) On cross-examination, the government elicited testimony that Ms. Rainbolt received modest tax refunds and bonuses in a few prior years. (*Id.* 34–36) She hypothetically could have used these funds to pay down her student loan debt, but did not, instead paying other expenses and ensuring she had a modest rainy day fund. (*Id.* 70–71) But I do not agree with the government that this warrants the denial of discharge. Nitpicking sixteen years during which a debtor tried hard and did what she could to repay her student loan debt, and disputing discharge because she used a couple thousand dollars in off-years for other sensible reasons, seems an argument distant from the text of Section 523(a)(8).

Congress's text appears to target the debtor's *ability to pay*: student loan debts aren't discharged unless "excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). If, for example, the Rainbolts were truly destitute today, but instead of paying down student loans two, five, and ten years ago Ms. Rainbolt had put modest tax refunds into a rainy day savings account (so that, for example, she could fix the car she drives to commute to work if it happened to break down) rather than paying down student debt, that would not be a compelling reason to deny discharge. Yet the government's argument would oppose discharge on those facts, and I suppose someone harshly interpreting the "judicial gloss" of *Brunner* and *Roberson* might agree.

14

The court creating *Brunner*'s test confessed that "[t]here is no specific authority for this [good faith payment history] requirement." *In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y. 1985). It read this burden into Section 523(a)(8) by "infer[ring]" Congressional intent from legislative history—from "comments [in] the Commission report" presented to Congress when it passed the statute. *Id.* (citing Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93-137, Pt. I, 93d Cong., 1st Sess. (1973) at 140 n.14 (the "Comm'n Report")). In this way *Brunner*'s rationale is a relic of history; in the 1980s and 90s some judges,[15] academics,[16] and even naïve law students[17] saw material value in using legislative history to interpret and apply statutes based on Congress's intent. But the widespread use of these materials absent a genuine statutory ambiguity has since largely been discredited.[18] And again, the Seventh Circuit, applying Section 523(a)(8), has directed me to ignore even prior "judicial glosses" in favor of the statutory text, *Krieger*, 713 F.3d at 884, so it is hard to understand why a

---

[15]   *E.g.*, *AHA v. N.L.R.B.*, 899 F.2d 651, 657 (7th Cir. 1990) ("If, however, Congress does enact a statute, the committee reports explaining it may have considerable significance in guiding interpretation. We say this fully aware that a growing number of judges disagree.")

[16]   *Compare, e.g.*, W. Eskridge, *Legislative History Values*, 66 CHI-KENT L. REV. 365 (1991) *with Hon. Frank H. Easterbrook*, *What Does Legislative History Tell Us?*, 66 CHI-KENT L. REV. 441 (1991).

[17]   Michael B. Slade, *Note*, *Democracy in the Details: A Plea for Substance Over Form in Statutory Interpretation*, 37 HARV. J. LEGIS. 187 (2000).

[18]   *E.g.*, *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, -- U.S. --, 2026 WL 1686059, at *9 (June 11, 2026) ("[T]he dissent hopes to revive that old-time devotion to legislative history. Instead of winning converts, however, the dissent illustrates why statutory interpretation must focus on the text—or, to borrow from Justice Robert Jackson, why interpretation must be driven by 'analysis of the statute' rather than 'psychoanalysis of Congress.'" (internal citations omitted)); *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 645 (2026) (rejecting the dissent's statutory interpretation because it "relies extensively on a series of inferences drawn from scant legislative history"); *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 673–74 (2020) ("This Court has explained many times over many years that when the meaning of the statute's terms is plain, our job is at an end."); *Wooden v. United States*, 595 U.S. 360, 381 (2022) (Barrett, J., concurring) ("[T]he problems with legislative history are well rehearsed."). Worse still is the type of legislative history relied upon within *Brunner* and *Roberson*'s "judicial gloss," as "excerpts from committee hearings are among the least illuminating forms of legislative history." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (internal quotation omitted); *see generally* Scalia and Garner, *supra* n. 8, at 369–90 (persuasive chapter rejecting "[t]he false notion that committee reports and floor speeches are worthwhile aids in statutory construction").

15

Commission report Congresspersons may not have even read would help me apply the statute to these facts.  I begin and end with the statutory text whenever possible.  I see no reason to import Congressional intent gleaned from a Commission report into my analysis where the Seventh Circuit has both emphasized the limitations of unenacted commentary, *see Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1052 (7th Cir. 2013) ("Resort to legislative history is only justified where the face of the statute is inescapably ambiguous." (internal quotation omitted)), and advised that no meaningful history exists to help interpret and apply the statute at issue, *see O'Hearn*, 339 F.3d at 564 (confirming that the legislative history of Section 523(a)(8) does not "provide meaningful guidance").

*Roberson*, citing the same Commission report referenced above to justify following *Brunner*, read the concept of *fault* into Section 523(a)(8)'s standard, stating that "undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from "factors beyond his reasonable control.'"  999 F.2d at 1136 (quoting the Comm'n Report).  I see some conceptual connection to one dictionary definition of "undue" ("unwarranted" or "contrary to justice") but material emphasis on *fault* seems like more of the judicial gloss referenced in *Krieger*.  The relevant statutory text[19] and structure[20] suggests focus on the *gravity* of the debtor's plight rather than the *reason* for his or her extremis.  Section

---

[19]   "Undue" is an adjective that modifies the noun "hardship," and the statutory question under Section 523(a)(8) is whether paying these debts creates an "undue hardship" for the debtor *and his or her dependents*.  This doesn't seem to ask whether the *discharge* is unjust (because a debtor's prior misconduct exacerbated his situation) but whether the *hardship* (the financial extremis) is excessive.

[20]   The portions of Section 523(a) that require a causal analysis of *fault* for particular debts are explicitly spelled out elsewhere.  *See* 11 U.S.C. § 523(a)(1)(C) (exempting from discharge tax or customs claims if the debtor "willfully attempted in any manner to evade or defeat such tax"); *id.* 523(a)(4) (exempting from discharge debts incurred through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny"); 523(a)(6) (exempting from discharge debts for willful and malicious injury); 523(a)(9) (exempting from discharge debts from vehicle accidents where the debtor was intoxicated).  Section 523(a)(8), read in the context of 523(a) as a whole, doesn't seem like it exempts from discharge student loan debts that are impossible to pay today if the debtor could have made a few payments earlier—that "judicial gloss" on the word "undue" seems a stretch.

16

523(a)(8) sets a heightened standard to discharge student loans for financial reasons: to "safeguard[] the financial integrity of the student loan program by not permitting debtors who obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices." *O'Hearn*, 339 F.3d at 564 (quoting *Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305–06 (3d Cir. 1995). By statute, we discharge student loans only where the debtor proves that he or she cannot under any reasonably foreseeable circumstances actually pay them. Adding to this high burden the extreme requirement the government suggests here—myopic focus by a debtor on repaying student debt regardless of anything else happening in his life, resulting in a payment history unblemished by any arguably negligent mistakes—is not in my view what Congress directed us to do.

Here, Ms. Rainbolt has made seventy payments on her student loans, totaling $21,538. (*See* DX B § IV(21); DX C; DX D) She testified credibly that she has been in constant contact with her loan servicer, made the payments that she could, and requested forbearance (which was granted) only when times were tough; even then, when able to start paying, she did. (Tr. 10) Ms. Rainbolt also recertified her income every year as required to ensure that she and her servicer were in agreement that she was paying all that her income supported. (*Id.*) Even in the regulatory chaos of the past few years where the student loan repayment program has been in flux, Ms. Rainbolt made additional payments. (*See* DX C, DX D) Under any reasonable definition of good faith, Ms. Rainbolt's conduct qualifies. *See Bukovics*, 612 B.R. at 180–81 (finding good faith where the debtor made eighty-nine payments totaling $28,346.76 while, during the same twelve-year period, she took forty-two months of forbearance through one two-year forbearance (1997–1999), one one-year forbearance (2000–2001), and one six-month

17

forbearance (2004)); *In re Krieger*, No. 11-80144, 2012 WL 1155687 at *1 (Bankr. C.D. Ill. Apr. 5, 2012), *rev'd sub nom. Educ. Credit Mgmt. Corp. v. Krieger*, 482 B.R. 238 (C.D. Ill. 2012), *rev'd and remanded*, 713 F.3d 882 (finding good faith where debtor made only $5,000 in payments over ten years while spending most of a divorce settlement on other expenses); *O'Hearn*, 339 F.3d at 563 (agreeing that the debtor made good faith efforts to repay even though debtor accrued home equity instead of repaying student loan debt).

A debtor's prior conduct during the repayment period can surely be relevant in assessing whether requiring them to make more payments on their student loan debt is an undue hardship. Discharging someone who could pay but cavalierly ignored their student loans when millions of people make sacrifices to pay them is not appropriate outside extraordinary circumstances. Thus, in an extreme case—where a debtor recklessly lives to excess for years while disavowing his student loan obligations—an impossibly crushing financial burden created by student debt might still be nondischargeable because whatever hardship the debtor is facing is not "undue." But that sort of extreme case is far from this one.

To the extent a demonstration of "good faith prior payment efforts" is statutorily required, it might be fair to ask whether, while a debtor's student loans have been outstanding, the debtor made reasonable or otherwise understandable choices, or whether they were instead indifferent—even contemptuous—of their student loan repayment obligations. But Congress certainly did not direct us to deny discharge to debtors who cannot reasonably make required student loan repayments going forward merely because they could hypothetically have made a few more payments along the way. Under any reasonable application of this third prong of the *Brunner* and *Roberson* standard, the Rainbolts pass.

18

IV.

For the reasons stated above, based on the evidence at trial, Ms. Rainbolt did not satisfy

her burden to have her student loans discharged at this time pursuant to 11 U.S.C. § 523(a)(8).

Thus, I will enter a separate order and judgment in favor of the defendants.

Dated:  June 22, 2026

_____

HON. MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE